**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| RODOLFO A. CONTRERAS, | ) | Case No.: 1:19-cv-01785-NONE-JLT (HC) |
| Petitioner, | )<br>)<br>) | FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS |
| v. | )<br>) | CORPUS |
| J. W. SULLIVAN, Warden, | )<br>) | [THIRTY DAY OBJECTION DEADLINE] |
| Respondent. | )<br>) | |
| | ) | |

Petitioner is currently serving a sentence of twenty years to life after a jury found him guilty of second degree murder and driving under the influence causing injury. He filed the instant habeas petition challenging the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED**.

**I.       PROCEDURAL HISTORY**

While under the influence of marijuana, Petitioner caused a traffic collision in Bakersfield that killed another driver, David A., and injured David's wife, Kathleen A. Petitioner was charged with and convicted by jury of second degree murder (Pen. Code, § 187, subd. (a) (count 1)), gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a) (count 2)), and driving under the influence and causing bodily injury to Kathleen (Veh. Code, § 23153, former subd. (e) (count 3)). People v. Contreras, No. F074151, 2018 Cal. App. Unpub. LEXIS 8480, at *1 (Dec. 13, 2018). In addition, the jury found true the sentence enhancement allegation for multiple victims attached to count 2 (as to

1

Kathleen) and count 3 (as to David), and it found true the sentence enhancement for personal infliction of great bodily injury (GBI) attached to count 3 (as to Kathleen). Id. at *1-2. The trial court sentenced Petitioner to a total term of 15 years to life plus five years in state prison. Id. at *2.

The Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On December 13, 2018, the Fifth DCA affirmed the judgment. Id. Petitioner filed a petition for review in the California Supreme Court, and the petition was denied on February 20, 2019. People v. Contreras, No. S253555, 2019 Cal. LEXIS 1427 (Feb. 20, 2019). Petitioner filed the instant habeas petition on March 11, 2020. (Doc. 10.) Respondent filed its answer on May 21, 2020. (Doc. 16.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

### I. The Collision

On March 8, 2014, in the late morning, defendant was driving southbound on Gosford Road in Bakersfield at a high rate of speed. He lost control of his white Honda, crossed over the center median into oncoming traffic and hit a blue Ford Explorer. The force of the impact split defendant's Honda in two. The engine compartment dropped at the point of impact. The passenger compartment traveled through the air and skimmed the top of a second blue Explorer driven by M.J., causing only minor roof damage. A third vehicle, a silver Toyota, was also struck. David, who was driving the first Explorer hit, died at the scene from severe head injuries. His wife, Kathleen, was injured but survived.

After defendant's Honda collided with David's Explorer and split apart, the contents of the passenger compartment spilled into the roadway. In this debris field, responding law enforcement personnel located a bong for smoking marijuana wax. Inside the passenger compartment of defendant's Honda, they located several containers of marijuana wax, several bags of marijuana, a pipe and a bottle of cannabis from a marijuana dispensary.

### II. Percipient Witness Testimony

### A. Kathleen

Kathleen testified that she and David were on their way to look at houses that day. David was in the left northbound lane on Gosford Road approaching Stockdale Highway and he was slowing in preparation to turn. Kathleen was in the front passenger seat talking to David when he said, "Oh, God, babe." Their vehicle was then hit. Kathleen told David she could not breathe, but he did not respond and she could not see him due to the vehicle damage.

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

Someone helped Kathleen out of the Explorer and she ran around to David's side but was unable to get to him because the vehicle was so badly damaged. Kathleen was then pulled away from the wreck by other people and subsequently treated by paramedics before being transported to the emergency room at Kern Medical Center (KMC). She sustained cuts to her face from glass and a fractured finger, had to have glass surgically removed from her foot, developed a neck infection, and testified she continues to suffer from neck, shoulder and hip issues. She also testified she was scheduled to have neck and shoulder surgery soon.

**B. Eric E.**

Prior to the collision, Eric E. was approaching the same intersection as David and Kathleen from the southbound direction. The windows to his truck were rolled down and he had been watching defendant's white Honda in his mirrors "[f]or quite a bit." Eric testified the Honda was going very fast and he could hear it accelerating as it approached him from behind. As Eric came to a stop at the red light, the Honda swerved around him, ran the red light and became airborne with all four tires off the ground. Eric testified defendant was "flying" and he estimated defendant was going "close to 100 when he hit the intersection." The Honda crossed the center median and, at a tilt, collided with David's and Kathleen's vehicle and split in two pieces.

After the light turned green, Eric drove through the intersection, parked his truck and got out to help. He and two other men tried without success to get David's door open. Eric then walked over to the curb where Kathleen was being assisted by another woman. The two of them removed glass from Kathleen's face before Eric left to check on the other vehicles involved. As he approached the passenger compartment of defendant's Honda, which was upside down in the road, defendant crawled out of the car on all fours and complained his toe hurt.

Eric testified defendant seemed "kind of out of it," like he did not know what was going on. Eric also testified he had seen people impaired by marijuana and defendant looked like that: dilated eyes, slow to respond and lethargic. Upset and frustrated, Eric cursed at defendant and was told by someone else to walk away, which he did before again returning. Eric explained to the jury that he was agitated because someone just died and defendant was complaining about his toe.

**C. Theresa A.**

The wall at the rear of Theresa A.'s backyard abutted Gosford Road. After hearing a loud crash, Theresa, a registered nurse, hopped over the wall to the roadway on the other side. She approached David's and Kathleen's Explorer and determined David had no pulse. Kathleen was conscious and hysterical. Theresa was able to coax Kathleen out of the car and get her to the curb, where Theresa focused on keeping Kathleen away from the wreckage until paramedics came.

While at the scene, Theresa also approached defendant's Honda. She testified he was still inside and screaming, "I want my pot," "I want my marijuana," "I want my wax," "It's not my day to die," "[M]y toe," and "[W]here is my puff?" He also stated, "I have

3

a card," and "[I]t's legal." Theresa asked defendant if he realized he just killed someone, but he did not respond to the question and kept repeatedly screaming about his marijuana and wax. Theresa testified defendant was alert, but she did not check if he was oriented to time and place. She stated his eyes were open and he made sense when he talked, but he never asked about anyone else.

**D. M.J.**

M.J. was driving northbound on Gosford Road and was positioned behind David's and Kathleen's vehicle. M.J.'s wife, Christy S., and their son were also in the vehicle. M.J. was slowing down as the light changed to red when she saw something white flash through the air. She hit the brakes and ducked as the passenger compartment of defendant's Honda flew over the top of her Explorer, leaving only some scratches. M.J. and Christy exited their vehicle and Christy, also a registered nurse, approached defendant's Honda as he crawled out. M.J. testified defendant said this was the second time he flipped a car and he was saying, "Just fucking kill me now," "I wish God would kill me," and "I want to get high. I just want to get high."

After determining that defendant seemed fine except for an injured toe, M.J. heard Kathleen screaming. Christy ran over to David's and Kathleen's vehicle and took Kathleen in her arms. Christy shook her head at M.J., which M.J. interpreted as a signal that David did not make it.

M.J. told an officer that defendant was awake and alert but "fitsy." She explained she meant defendant did not seem able to focus on what had just occurred or the severity of it. He did not answer when asked if he was okay, did not seem to realize that his dog had flown out of his car and underneath a smashed vehicle, and did not appear to have a grasp on what had just happened.

**III. Defendant's Statements at Hospital**

**A. Dr. Heer**

Defendant was also transported to KMC. Dr. Jagdipak Heer, who was the supervising physician on duty at the emergency room that day, testified that defendant complained of pelvic, back and toe pain, and that he was hostile and yelled at staff. Defendant's medical records reflect staff had "a concern about severe intoxication." Defendant reported using marijuana daily, and his urinalysis was positive for THC and opiates. Dr. Heer testified defendant was given morphine at the hospital, but he was not aware whether that occurred before or after the urinalysis.

At the time defendant's blood was drawn for testing approximately one hour after the collision, he was cooperative. He told the nurse drawing his blood that he smoked marijuana daily and had a medical marijuana card. He also stated that two weeks earlier, he was in a rollover accident.

**B. Officer Beahm**

4

Officer Aaron Beahm arrived at the hospital at approximately 1:30 p.m. and spoke with defendant. Defendant was lying on a gurney hooked up to an IV and monitors, and his neck was in a cervical collar. He was cooperative and reported having a prior serious head injury but declined to provide details and said it did not result in brain damage.

Beahm, who testified as an expert in drug recognition, stated that the objective signs of THC impairment are red eyes, an odor of marijuana emanating from the breath and a green coating on the tongue. Alcohol was ruled out as a factor via a breath test, but Beahm observed defendant had red eyes and a green-coated tongue. Because defendant was on a gurney in a neck collar and hooked up to various machines, Beahm was unable to conduct field sobriety testing other than a horizontal gaze nystagmus (HGN) test, a vertical gaze nystagmus (VGN) test and a convergence test. Defendant did not have HGN or VGN, he had a lack of convergence and his pupils were normal. Beahm explained such results do not rule THC impairment in or out, as they are consistent with either THC impairment or a lack of any impairment. Beahm was unable to reach a conclusion whether or not defendant was impaired by THC; there were some signs of recent ingestion but he was unable to conduct more comprehensive testing given that defendant was at the hospital receiving medical care.

Defendant possessed a medical marijuana card issued by Bakersfield 420 Evaluations and he told Beahm he obtained the card for an eating disorder and migraines. He also told Beahm he started using marijuana when he was 14 years old and had been "turned on to" marijuana wax about a year earlier. He reported using marijuana almost daily but told Beahm he last used it two days earlier. Defendant said he prefers using marijuana wax, which provides a stronger, longer lasting high comparable to morphine. He told Beahm that he woke up at around 11:00 a.m. that day and drove to the dispensary, where he purchased some leafy marijuana and marijuana wax. He said that at the time of the collision, he was on his way to ingest marijuana at a park or his mother's house.

**C. Officer Gospich**

Finally, defendant gave a recorded statement to Officer Gospich that was played for the jury. Defendant asked Gospich if anyone died in the collision and stated, "It should have been me dying, you know that? What the fuck? Can I just fucking die already man? This is bullshit. Just fucking take me God. Fuck." Defendant denied driving while drunk or high and said he learned his lesson when he flipped his car on Westside Parkway the month before after swerving to miss someone who cut him off.

Defendant told Gospich he had been smoking marijuana since the age of 14 and smoked it when "stressing." He stated he smoked every day and had a medical marijuana card for eating issues and migraines. He also stated he uses marijuana to sleep and for pain.

On the day of the collision, he awoke at 11:00 a.m., went to a marijuana dispensary to purchase marijuana and headed to his mother's house. He stated he was going the speed limit, between 40 and 50 miles per hour, and driving "normal" when he hit a bump in the road, which caused his car to go out of control. He then lost control of the car trying to correct it and went off to the side. He said the stoplight was green at the time and he

was decelerating. He later said he was possibly going 60 miles per hour but not 80 or 100 and then, as the exchange with Gospich became testier, he stated he did not know how fast he was going. Defendant also repeatedly said he should have died and he wished he had died. He maintained that the collision was an accident, that he was not driving in a rush, and that he was not drunk or high. He stated he last used marijuana two days before the collision, and later stated he was up all night on Thursday, smoked a lot of marijuana, went to bed around midnight on Friday and woke up at 11:00 a.m. on Saturday, the day of the collision.

## IV. Accident Reconstruction

Officer Timothy Berchtold, who at the time of the collision was a traffic collision reconstructionist with the Bakersfield Police Department, testified that defendant caused the fatal collision by driving at an extremely high rate of speed, running the red light and swerving into David's and Kathleen's Explorer. He testified defendant never applied the brakes and the Honda was checked for and cleared of mechanical defects.

Berchtold testified the speed limit where the collision occurred is 55 miles per hour and the speedometer of defendant's Honda was locked in place at 70 miles per hour, which was most likely defendant's speed when the car broke apart in the collision. Berchtold testified that, based on one calculation, defendant's Honda was traveling between 68 and 79 miles per hours, approximately, when it created the critical speed scuff, which is the tire mark left on a roadway when a vehicle begins to sideslip. Berchtold explained, however, that the range is designed to give drivers the benefit of the doubt and, based on an analysis of the critical speed scuff, he believed defendant was going at least 79 or 80 miles per hour when the Honda began to sideslip.

## V. Toxicology Evidence

## A. Prosecution's Expert

Defendant's blood was drawn at the hospital approximately one hour after the collision and tested for THC. Bill Posey, the director of the independent laboratory that conducted the testing, testified as the prosecution's toxicology expert. Posey informed the jury that defendant's blood test results revealed the presence of 16 nanograms per milliliter of THC and 155 nanograms per milliliter of carboxylic acid metabolite (COOH), an inactive metabolite that at that level indicates a heavy user of marijuana.

Posey testified that THC is at its peak level in the blood while the user is smoking marijuana. The user's THC level then drops rapidly and exits the system within six hours, with the most rapid drop occurring the first hour after smoking. He also testified that impairment occurs 45 to 60 minutes after ingestion and experts recommend refraining from driving for two to three hours after reaching peak THC level.

Posey explained that marijuana wax has a higher concentration of THC than does leafy marijuana, and it results in a stronger high for the user and a higher level of THC in the blood. While the level of THC in the blood falls off at a similar rate for marijuana wax and leafy marijuana, the initial drop-off is greater with wax. Posey stated that while there

6

is no formula that would allow him to determine, based on defendant's blood test results, the level of THC in defendant's system at the time of the collision, it was necessarily higher at the time of the collision given the rapid drop-off that occurs during the first hour after usage. Although Posey testified he could not determine at what level defendant would be impaired, he stated there was only a slim chance that defendant was not impaired at 16 nanograms per milliliter of THC and, in his opinion based on a hypothetical mirroring the facts of the fatal collision and involving a daily user of marijuana with 16 nanograms per milliliter of THC in his blood one hour after a crash, the driver was impaired. Posey testified that a driver in that situation would be slower to react to a changing light, might run the light and might also overreact or make an incorrect decision such as crossing the center median to the left.

With respect to impairment, Posey testified that recent research correlated eight nanograms per milliliter of THC with a blood-alcohol content (BAC) level of 0.05 percent, 13 nanograms per milliliter of THC with a BAC level of 0.08 percent, and 20 nanograms per milliliter of THC to a BAC level of 0.10 percent or greater. Posey also testified that for the purpose of determining driving impairment, particularly in states that have legalized marijuana, a group of experts advising the National Highway Traffic Safety Administration recommended a level of 5 nanograms per milliliter of THC, although Posey opined that might be on the low side and a level of eight to nine nanograms per milliliter might be more appropriate based on a larger group of heavier users. Posey also testified that studies originally showed marijuana users drove more cautiously, but were less likely to react correctly to a change in driving conditions. However, in a laboratory setting, researchers were starting to see heavy marijuana users driving fast and aggressively.

**B. Defense Expert**

Darrell Clardy, a forensic toxicologist who testified for the defense, stated that defendant's THC and COOH levels indicated defendant was a heavy user of marijuana and that he had smoked marijuana within three to six hours before his blood was drawn for testing. On cross-examination, Dr. Clardy testified that defendant smoked marijuana no earlier than three hours before his blood draw.

Dr. Clardy explained that impairment level is individual and varies depending on whether use is light, moderate or heavy. He cited studies showing that occasional users with no tolerance for marijuana drive under the speed limit by approximately 10 miles per hour and are more cautious. In his opinion, a THC level of 15 nanograms per milliliter in light to moderate users "would be significant" and would impair the drivers' divided attention skills, reaction time and decision-making ability. Dr. Clardy testified that the critical factor in this case was defendant's heavy usage; heavy users feel the effects of the marijuana, but they develop a high tolerance to the drug and its usage does not impair their driving. Dr. Clardy also testified that with respect to divided attention skills, heavy users of marijuana can develop a tolerance to the drug, unlike with alcohol use.

Given a hypothetical involving a driver who uses marijuana heavily to control anxiety,

had a THC level of 16 nanograms per milliliter and was driving 70 to 72 miles per hour, weaving in and out of traffic, and running a red light, Dr. Clardy testified that the individual was driving recklessly but was not impaired by the marijuana. He explained, "It's the fact that the drug is not treating the anxiety that's causing the impairment, so it's the anxiety. Another way to look at it, he didn't have enough of the marijuana to make him drive slowly and stay away from things and be careful the way marijuana causes a person to drive, so it's the lack of the drug and the anxiety that causes the accident. It's the compounding factor."

## VI. Prior Rollover Collision

Approximately one month before the fatal collision, defendant rolled the black Honda he was driving. Lucille M. testified that she was driving westbound in the left lane of Westside Parkway going the speed limit of approximately 60 to 65 miles per hour. In her rearview mirror, she saw a car approaching from a distance and travelling approximately 85 miles per hour. She signaled and moved into the right lane, and, in her left mirror, she saw the car rolling over into the median between the westbound and eastbound lanes. Lucille exited the road and called 911 to report the accident. She told the dispatcher defendant "was going so fast" and she "saw him coming like a bullet ...."

Officer Lorena Vasquez responded to the call. She found a black Honda with major damage overturned by the center divider. Defendant told her he was switching lanes at the same time as the vehicle in front of him and he lost control trying to avoid the other vehicle.

## VII. Other Evidence

The prosecutor also called an investigator with the California Department of Motor Vehicles. Robert Stevenson testified that when an individual applies for a California driver's license or identification card, he or she fills out a form that is signed under penalty of perjury and includes an attached advisement regarding the dangers of driving while impaired by alcohol or drugs. The prosecutor introduced evidence that, prior to the collision, defendant had completed the driver's license application form with the attached warning on three occasions.

Denise Roman, the office manager and medical assistant at Bakersfield 420 Evaluations, testified that patients fill out and sign an intake form. The form requires the patient to initial the acknowledgement, "I agree not to drive a car or operate dangerous or heavy equipment while using marijuana." Patients are also required to initial the warning that the clinic will revoke its recommendation for marijuana if the patient is charged with driving under the influence of marijuana. The patient's signature on the last page of the form certifies he or she has initialed the disclosure with "a full understanding."

Contreras, No. F074151, 2018 Cal. App. Unpub. LEXIS 8480, at *3-19.

## III.   DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203

1
2
3
4

(2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

5
6
7
8
9
10
11
12
13

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert. denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

14
15
16
17
18

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

19
20
21
22
23

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

24

C.      Review of Petition

25
26
27

The petition presents the following claims for relief: (1) The evidence was insufficient to support the jury finding of implied malice; and (2) The trial court abused its discretion by admitting evidence that Petitioner had previously caused an accident due to his reckless driving.

28

1.      Sufficiency of the Evidence

10

Petitioner contends that there was insufficient evidence to support his convictions for second degree murder and gross vehicular manslaughter and the jury finding of implied malice. (Doc. 10 at 5-6, 18-31.) Petitioner raised this claim on direct review in the state courts. In the last reasoned decision, the appellate court denied the claim as follows:

**A. Standard of Review**

Defendant challenges his convictions for second degree murder and gross vehicular manslaughter as unsupported by sufficient evidence. "The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, 109 S. Ct. 2419, 105 L. Ed. 2d 218, citing *In re Winship* (1970) 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, 75 Cal. Rptr. 3d 289, 181 P.3d 105). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055, 191 Cal. Rptr. 3d 182, 354 P.3d 90.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....'" (*People v. Nguyen, supra*, at pp. 1055-1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio, supra*, at p. 357.) However, "speculation, supposition and suspicion are patently insufficient to support an inference of fact." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951, 203 Cal. Rptr. 3d 876; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35, 61 Cal. Rptr. 2d 84, 931 P.2d 262; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268, 155 Cal. Rptr. 3d 877.)

**B. Conviction for Second Degree Murder**

**1. Implied Malice**

Murder is an unlawful killing with express or implied malice aforethought. (§§ 187, subd. (a), 188; accord, *People v. Rangel* (2016) 62 Cal.4th 1192, 1220, 200 Cal. Rptr. 3d 265, 367 P.3d 649.) It is well settled that causing a fatal traffic collision may support a conviction for second degree murder if there is substantial evidence of implied malice. (*People v. Watson* (1981) 30 Cal.3d 290, 300-301, 179 Cal. Rptr. 43, 637 P.2d

11

279 (*Watson*); accord, *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358, 197 Cal.
Rptr. 3d 1; *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1112-1113, 178 Cal. Rptr.
3d 28, disapproved in part on other grounds by *People v. Hicks* (2017) 4 Cal.5th 203,
214, fn. 3, 226 Cal. Rptr. 3d 565, 407 P.3d 409; *People v. Johnigan* (2011) 196
Cal.App.4th 1084, 1090, 128 Cal. Rptr. 3d 190; *People v. Superior Court* (*Costa*) (2010)
183 Cal.App.4th 690, 697, 107 Cal. Rptr. 3d 576 (*Costa*).)

Implied malice has ""'both a physical and a mental component. The physical component
is satisfied by the performance of 'an act, the natural consequences of which are
dangerous to life.' [Citation.] The mental component is the requirement that the
defendant 'knows that his conduct endangers the life of another and ... acts with
conscious disregard for life.' [Citation.]""" (*People v. Soto* (2018) 4 Cal.5th 968, 974,
231 Cal. Rptr. 3d 732, 415 P.3d 789, quoting *Watson, supra*, 30 Cal.3d at p. 300.) That
is, "malice may be implied when [the] defendant does an act with a high probability that
it will result in death and does it with a base antisocial motive and with a wanton
disregard for human life." (*Watson, supra*, at p. 300.) It "requires a defendant's
awareness of engaging in conduct that endangers the life of another—no more, and no
less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 59 Cal. Rptr. 3d 157, 158 P.3d
731.)

"Implied malice is determined by examining the defendant's subjective mental state to
see if he or she actually appreciated the risk of his or her actions. [Citations.] Malice
may be found even if the act results in a death that is accidental. [Citation.] It is
unnecessary that implied malice be proven by an admission or other direct evidence of
the defendant's mental state; like all other elements of a crime, implied malice may be
proven by circumstantial evidence." (*Costa, supra*, 183 Cal.App.4th at p.
697.) In *People v. Batchelor, supra*, 229 Cal.App.4th at pages 1114-1115, the Court of
Appeal discussed four factors relevant to guiding the determination, but "courts have
recognized that there is no particular formula for analysis of vehicular homicide cases,
instead requiring a case-by-case approach." (*Costa, supra*, at p. 698.) Indeed, lack of
intoxication or absence of a high speed flight from police "'does not preclude a finding
of [implied] malice'" (*ibid.*), nor does a finding of implied malice require "a 'predicate
act'" such as a prior driving under the influence (DUI) conviction, a DUI-related
accident, or a judicial or drug rehabilitation-related admonition of the dangers of driving
while intoxicated (*People v. Johnigan, supra*, 196 Cal.App.4th at pp. 1090-1091).

**2. Analysis**

Defendant acknowledges that there is evidence he was driving while impaired by
marijuana, was speeding, ran a red light, had a prior rollover crash, and had been given
written warnings about the danger of driving while under the influence of marijuana,
but he argues that this case does not share in common those factors found by other courts
to be sufficient to support a finding of implied malice. Defendant contends the evidence
"fails to establish blatantly dangerous driving," and he characterizes his driving as
negligent, "only slightly hazardous," and "minor" in comparison with that at issue in
other cases. He also contends his level of impairment was only moderate, and the
evidence of his prior rollover crash and warnings from the DMV and the marijuana

dispensary is insufficient to show his awareness of the dangers of reckless or impaired driving.

Defendant concedes the law does not require the presence of any particular factors. He nevertheless urges us that the evidence is insufficient to support the jury's finding of implied malice. We do not agree. "'If the circumstances reasonably justify the trier of fact's findings, [as they do here,] reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890, 207 Cal. Rptr. 3d 228, 378 P.3d 615; accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1215, 144 Cal. Rptr. 3d 716, 281 P.3d 799.)

As defendant acknowledges, there is no specific factual formula at play and we must instead consider the circumstances in this case. (*People v. Johnigan, supra*, 196 Cal.App.4th at p. 1091; *Moore, supra*, 187 Cal.App.4th at p. 942; *Costa, supra*, 183 Cal.App.4th at p. 698.) The evidence demonstrated that defendant was speeding down a two-way, multi-lane city street and weaving around traffic before he ran a red light without even attempting to brake. At the point defendant lost control of his car, which shot across the center median and became airborne, he was going approximately 25 miles per hour over the speed limit. Even the defense expert concurred that defendant was driving recklessly and that his reckless driving was the cause of the collision. Thus, we find defendant's description of his driving as "nothing like the disgracefully reckless driving" at issue in the other cases unpersuasive.

Regarding evidence of his THC level and its correlation to a BAC level of between 0.08 and 0.10 percent, defendant claims "his impairment was not extraordinarily high" and the "jury could not rationally infer that [his] level of impairment was particularly aggravating to support the conclusion that [he] must have known his driving endangered the lives of others." As defendant acknowledges, however, there is no requirement that a finding of implied malice be supported by evidence of *any* impairment. (*Ortiz, supra*, 109 Cal.App.4th at p. 112 [the defendant was convicted of second degree murder based on reckless driving and in the absence of any evidence he consumed alcohol or other intoxicant on day of collision]; *People v. Contreras, supra*, 26 Cal.App.4th at pp. 955-957 [evidence of reckless driving in a tow truck with defective brakes sufficient to support jury's finding of implied malice; evidence of impairment or high speed chase not required].) In this case, there is substantial evidence that defendant was under the influence of marijuana at the time of the collision; that drivers in certain other cases were *more* impaired than he is of no moment.

Defendant also acknowledges that "the evidence showed that prior to the date of the fatal collision, [he] had been exposed to written warnings at the Department of Motor Vehicles and the marijuana dispensary about the hazards of driving under the influence of marijuana, and had been in a rollover accident after speeding on the highway which involved no intoxication or impairment, no damage to other vehicles, no injury to other persons, no citation, no arrest, and no penal consequences," but claims that such "evidence fails to establish that [he] must have known the danger to life from impaired

or reckless driving." As discussed in greater detail in part II., "courts regularly admit prior instances of reckless driving on the question of intent" (*Moore, supra*, 187 Cal.App.4th at p. 943, citing *Ortiz, supra*, 109 Cal.App.4th at pp. 113-115), but a finding of implied malice may be made even in the absence of any prior instances of such driving (*People v. Johnigan, supra*, 196 Cal.App.4th at p. 1091 ["[T]here is no requirement of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice."]). Here, in inferring knowledge of the dangerousness of impaired or reckless driving, the jury was entitled to consider, along with the other circumstances, the evidence that defendant had received written warnings about driving while under the influence of marijuana and had, only one month before the fatal collision, rolled his car while driving recklessly. Defendant's argument, to the extent it may be interpreted as suggesting otherwise, is untenable.

In concluding that defendant's second degree murder conviction is supported by substantial evidence, we find the Court of Appeal's decision in *Moore* particularly instructive. In that case, the court flatly rejected the defendant's argument that "other cases contain factors not found here." (*Moore, supra*, 187 Cal.App.4th at p. 941.) The defendant in Moore was going approximately 35 miles over the speed limit when he ran a red light and hit a car, causing it to hit another car in turn. (*Id.* at p. 939.) A passenger in the car the defendant hit was killed, and the defendant continued on his way after the fatal collision. (*Id.* at pp. 939-940.) He was not under the influence of any intoxicant and he was not being pursued by anyone. (*Id.* at p. 939.)

The court stated in *Moore*, "It is true, the cases [the defendant] relies on, particularly *People v. Contrera*s, have factors not present here. But none of those cases hold that implied malice could not be found in the absence of those facts. *The question of implied malice is to be decided in light of all the circumstances*. [Citation.] Here, a properly instructed jury found implied malice. Under all the circumstances, the finding is reasonable." (*Moore, supra*, 187 Cal.App.4th at p. 942, italics added.) The court observed pointedly, "Whether [the defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [he] was aware of the risk." (*Id.* at p. 941.)

We note that defendant separately addresses his unsafe driving, his level of impairment and his prior knowledge of the dangerousness of reckless or impaired driving, and, for each, concludes that the evidence is insufficient to sustain a finding of implied malice. He then summarily concludes that implied malice may also not rationally be inferred by the totality of the circumstances. As we have stated and as defendant's summary conclusion suggests, it is well settled that, on review, we consider whether the totality of all the circumstances supports the jury's finding of implied malice. (*Moore, supra*, 187 Cal.App.4th at p. 942.) In considering evidence of the circumstances of defendant's reckless driving just prior to the collision, his THC impairment, his receipt of written warnings not to drive while under the influence of marijuana and his prior rollover collision that occurred while he was driving recklessly, there is ample evidence from which a reasonable jury could have concluded, as it did, that defendant acted "with a wanton disregard of the high probability of death," and that he did so with "a subjective

14

awareness of the risk." (*Id.* at p. 941; see *People v. Hicks, supra*, 4 Cal.5th at p. 215 [recognizing that driving "80 miles per hour through a red light in a densely populated urban area during the weekday rush hour ... can be likened to shooting a gun into a crowd; it is manifestly an act dangerous to human life," and concluding that the defendant was also on notice]; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 843-844, 128 Cal. Rptr. 3d 565 [street racing modified cars 50 to 60 miles above the speed limit after drinking beer and in an area where they knew there was a stop sign, and their callous conduct after the resulting fatal crash "overwhelmingly establishes [the] appellants' subjective awareness of the risk of death that their racing created and their callous indifference to its consequences"].) We reject defendant's claim to the contrary.

Contreras, No. F074151, 2018 Cal. App. Unpub. LEXIS 8480, at *19-29.

   *a.*  *Legal Standard*

  The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.  Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

  After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

  In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the

highly deferential standard of review in habeas proceedings, by noting that <u>Jackson,</u>

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

<u>Id</u>. at 2.

> *b.   Analysis*

Viewing the evidence in the light most favorable to the prosecution, it is clear that the state court's determination that there was sufficient evidence was not unreasonable. As noted by the state court, Petitioner was driving recklessly and drove through a red light at a speed above the posted limit. <u>Contreras</u>, No. F074151, 2018 Cal. App. Unpub. LEXIS 8480, at 24. Additionally, at the time of the collision, Petitioner was under the influence of marijuana. <u>Id</u>. at 25. Petitioner had also been in a previous accident driving recklessly, and had received written warnings about driving while under the influence of marijuana. <u>Id</u>. at 25-26. Petitioner fails to show that no fairminded jurist would agree with the state court's determination. Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the <u>Jackson</u> standard, and the claim should be denied.

    2.   <u>Admission of Evidence of Prior Rollover Crash</u>

Petitioner argues that the trial court abused its discretion by admitting evidence that he had previously caused an accident due to his reckless driving. (Doc. 10 at 7-8, 32-49.) Petitioner specifically argues that the prior uncharged rollover crash had little to no relevance because it was not sufficiently similar to the charged fatal collision. (<u>See id</u>.) Petitioner raised this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**A. Summary of Trial Court Proceedings**

Section 1101, subdivisions (a) and (b), of the Evidence Code provide:

16

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Prior to trial, the prosecutor moved via motion in limine to admit evidence under Evidence Code section 1101, subdivision (b), of defendant's solo vehicle rollover crash that occurred approximately one month prior to the fatal collision. Relying on the Court of Appeal's decision in *Ortiz*, the prosecutor sought to admit the evidence to show defendant's knowledge—that is, his subjective awareness—of the risk reckless driving presented to human life. (*Ortiz, supra*, 109 Cal.App.4th at pp. 112-113; accord, *Moore, supra*, 187 Cal.App.4th at p. 943.)

Defense counsel, arguing that *Ortiz* was distinguishable, opposed the motion on the ground that the rollover crash was not sufficiently similar to the fatal collision because it did not involve evidence of intoxication, it did not result in any citation or finding of wrongdoing against defendant, no other vehicle was involved, there were no injuries, and the cause of the collision was not determined. Counsel also argued that if the court found the evidence admissible under Evidence Code section 1101, subdivision (b), it should nevertheless be excluded under Evidence Code section 352 as unduly prejudicial.

The trial court concluded that evidence of the prior crash was probative of defendant's knowledge of the consequences of reckless driving and that it was not unduly prejudicial given it was less inflammatory than the evidence of the fatal collision.

**B. Summary of Parties' Positions on Appeal**

On appeal, defendant recognizes that Evidence Code section 1101, subdivision (b), permits the introduction of evidence to show a defendant's knowledge and that prior acts of reckless driving may be admissible in vehicular homicide cases. He argues, however, that the trial court erred in admitting the evidence in this case because the prior rollover crash and the fatal collision were not sufficiently similar to render the prior crash relevant. Defendant contends that the only similarities were speed, a rollover crash and major damage to the vehicle, and he points to the absence of proof that the rollover was caused by speeding or that he was at fault. He also contends there is no evidence the prior rollover crash involved intoxication and it did not involve damage to other vehicles or injuries to other people. Defendant concludes that "the evidence about the prior speeding and accident was irrelevant because it could not support a rational inference

17

that the prior incident caused [him] to acquire a subjective knowledge that driving at a high speed endangers human life."

Defendant also argues that even if the evidence had some relevance to the issue of his knowledge, it should have been excluded under Evidence Code section 352 as unduly prejudicial. He contends that any probative value was "small," "the jury's inevitable perception that [he] had not been punished for his speeding and accident one month before the fatal collision increased the potential for prejudice and confusion of the issues," and presentation of the evidence was "excessively time-consuming." Defendant maintains the erroneous admission of the evidence was prejudicial under both the state and federal standards of review.

The People disagree. They contend the evidence of defendant's speeding and reckless driving was highly probative of his knowledge and the evidence was neither unduly prejudicial nor unduly time consuming.

**C. Standard of Review**

We review a trial court's ruling on the admission or exclusion of evidence for abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85, 186 Cal. Rptr. 3d 797, 347 P.3d 952; *People v. DeHoyos* (2013) 57 Cal.4th 79, 131, 158 Cal. Rptr. 3d 797, 303 P.3d 1.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, 40 Cal. Rptr. 3d 118, 129 P.3d 321, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151, 74 Cal. Rptr. 3d 454, 180 P.3d 224, disapproved in part on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 87 Cal. Rptr. 3d 209, 198 P.3d 11. 421, fn. 22; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390, 178 Cal. Rptr. 3d 185, 334 P.3d 573.)

**D. Analysis**

**1. Evidence Code Section 1101**

"It has long been the rule ... that evidence of uncharged misconduct is inadmissible to establish a defendant's *propensity* to commit the offense charged. The bar on the use of such 'propensity evidence' is not that it lacks relevance. Rather, it is the concern that such evidence may be regarded by the trier of fact as *too* relevant, 'provoking,' ... 'an overstrong tendency to believe defendant guilty' based on the commission of the *prior* acts rather than those charged in the pending prosecution." (*Ortiz, supra*, 109 Cal.App.4th at p. 111.) "The *exceptions* to the bar on the admissibility of such evidence of uncharged acts are equally well established." (*Ibid.*) Relevant here, evidence of prior reckless driving may tend to show a "defendant's *knowledge*—gained in the course of the prior misconduct—of the natural consequences, dangerous to life, of the reckless operation of a motor vehicle, and of his persistence in that behavior, thus evidencing a conscious disregard for the lives of others on the road." (*Id.* at pp. 111-112.)

18

The parties rely on the decision in *Ortiz* to support their respective positions. The People have the better argument, however, as the facts of *Ortiz* undercut defendant's argument that the admission of the prior rollover crash evidence in this case was an abuse of discretion.

In *Ortiz*, the defendant was speeding and driving "'extremely dangerously'" prior to the fatal collision (*Ortiz, supra*, 109 Cal.App.4th at p. 107), but he was *not* under the influence of alcohol or any other intoxicant (*id*. at p. 111). The prosecutor introduced seven past incidents of prior uncharged misconduct, some of which involved driving under the influence of alcohol. (*Id*. at p. 110.) On appeal, the defendant challenged the admission of those prior incidents that were related to his drunk driving on relevancy grounds given that the fatal collision did not involve any intoxicants. (*Id*. at pp. 110-111.) The defendant also argued that if relevant, the failure to exclude the drunk driving evidence was error under section 352 of the Evidence Code. (*Ortiz, supra*, at p. 111.)

The Court of Appeal described the issue as "intriguing," and recognized that "[t]he bulk of [the post-*People v. Watson* cases affirming second degree vehicular murder convictions] involved the use of alcohol or other intoxicants in *both* the uncharged misconduct *and* the prosecution in which it was sought to be admitted." (*Ortiz, supra*, 109 Cal.App.4th at p. 112.) It concluded, however, that "[t]he resulting case law makes it clear ... that the contours of the 'knowledge' exception to the bar imposed by [Evidence Code] section 1101[, subdivision ](a) are not so restricted that the evidence at issue here was admitted erroneously by the trial court. In short, courts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway—whether provoked by the use of alcohol, of another intoxicant, by rage, or some other motivator—sensitizes him to the dangerousness of such life-threatening conduct. This is so because apprehensions for drunk driving, and the citations, arrests, stiff fines, compulsory attendance at educational programs, *and other consequences* do not take place in a vacuum." (*Id*. at pp. 112-113, italics added.)

In this case, defendant argues that the prior uncharged rollover crash had little to no relevance because it was not sufficiently similar to the charged fatal collision. "Whether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 241, 153 Cal. Rptr. 3d 740 [recognizing that in DUI cases, "other crimes evidence may be admissible even though similar only in a general way"].) In both the uncharged incident and the charged incident, defendant was speeding and driving recklessly when he lost control of his vehicle and rolled it. That the prior uncharged incident did not involve intoxicants and did not result in any citation against defendant, any damage to other vehicles or any injuries does not render it irrelevant.

In his reply brief, defendant criticizes the People for quoting from *Ortiz* but omitting the following line: "This is so because apprehensions for drunk driving, and the citations, arrests, stiff fines, compulsory attendance at educational programs, and other consequences do not take place in a vacuum." (*Ortiz, supra*, 109 Cal.App.4th at pp. 112-

113.) Defendant asserts that this omitted line explains and qualifies the appellate court's reasoning, and the present case lacks "any of the consequences enumerated in the *Ortiz* opinion." Nothing in *Ortiz* persuades us that admission of prior uncharged misconduct is limited to those incidents that resulted in citation, arrest or other formal civil or criminal penalties, however. Rather, the decision expressly speaks to those "*and other consequences*" (*id.* at p. 112, italics added), which include losing control and rolling a vehicle. The very point of the evidence is the "knowledge and understanding of the personal and social consequences" imparted by virtue of having been personally involved in a vehicle crash caused by speed and reckless driving. (*Id.* at p. 115.) Underscoring this link is the evidence that defendant repeatedly mentioned the prior rollover crash, both at the scene of the fatal collision and at the hospital.

Accordingly, we reject defendant's argument that the trial court erred in admitting the evidence of the prior rollover crash because it was not relevant and did not support a reasonable inference that defendant was subjectively aware of the dangers of driving recklessly at a high speed.

**2. Evidence Code Section 352**

**a. Prejudice Must be Undue**

Evidence admissible under Evidence Code section 1101 may nevertheless be excluded in the court's discretion under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." However, as the California Supreme Court has explained, "'"Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail. [Citation.] "'The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" [Citation.]' [Citation.] [¶] The prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]'" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491, 129 Cal. Rptr. 3d 91, 257 P.3d 703;

accord, *People v. Tran* (2011) 51 Cal.4th 1040, 1048, 126 Cal. Rptr. 3d 65, 253 P.3d 239 (*Tran*).)

### b. Nature of Uncharged Misconduct

Defendant argues that the evidence of his prior rollover crash should have been excluded under Evidence Code section 352, even if we find it is admissible under Evidence Code section 1101, subdivision (b). He reiterates that the probative value of the prior incident is low given the dissimilarities between the uncharged incident and the charged offense. However, as we have just discussed, we do not agree.

Although defendant does not specifically argue that the uncharged misconduct evidence is more inflammatory than the charged offense, we note that the California Supreme Court has recognized that any potential prejudice is decreased where the evidence of the uncharged misconduct is no stronger or more inflammatory than the evidence of the charged offense. (*Tran, supra*, 51 Cal.4th at p. 1047.) We again find the Court of Appeal's decision in *Moore* instructive in this regard.

In *Moore*, the court considered and rejected the defendant's claim that the trial court erred under Evidence Code section 352 in admitting evidence of the defendant's prior DUI conviction where the charged offense did *not* involve alcohol. (*Moore, supra*, 187 Cal.App.4th at pp. 943-944.) The court concluded that "[e]vidence of a prior drunk driving conviction pales in comparison to the evidence supporting the charged offense." (*Id.* at p. 943.)

Here, we have the reverse situation: there is no evidence defendant was under the influence of an intoxicant when the uncharged rollover crash occurred, while the charged offense involves driving under the influence of THC. We have no difficulty concluding that the evidence of the uncharged crash, which showed only that defendant was speeding and driving recklessly when he lost control and rolled his car, did not result in any undue prejudice; to the contrary the uncharged misconduct evidence was mild compared to the evidence of the charged offense. (*Moore, supra*, 187 Cal.App.4th at p. 943; see *People v. Brogna* (1988) 202 Cal.App.3d 700, 709, 248 Cal. Rptr. 761 ["The stronger the evidence, the more it is 'prejudicial.'"]; cf. *People v. Diaz* (2014) 227 Cal.App.4th 362, 381-383, 173 Cal. Rptr. 3d 594 [trial court committed prejudicial error under Evid. Code, § 352 when it permitted the prosecutor to show the jury two lengthy, highly inflammatory DUI education-related videos for purpose of demonstrating the defendant's awareness of the risks of drinking and driving; the emotional videos had "near certain potential for undue prejudice and ... marginal legitimate probative value"].)

### c. Prior Incident Unpunished

We are also unpersuaded by defendant's argument that the jury's perception he was not punished for the prior uncharged rollover crash increased the risk of prejudice and confusion of issues. The California Supreme Court has recognized "that the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in

21

actual *convictions* and a prison term, ensuring that the jury would not be tempted to convict the defendant simply to punish him for the other offenses, and that the jury's attention would not be diverted by having to make a separate determination whether [the]defendant committed the other offenses." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917, 89 Cal. Rptr. 2d 847, 986 P.2d 182, citing *People v. Balcom* (1994) 7 Cal.4th 414, 427, 27 Cal. Rptr. 2d 666, 867 P.2d 777; accord, *Tran, supra*, 51 Cal.4th at p. 1047.) However, this factor reflects but one consideration under Evidence Code section 352 and is not dispositive. (*Tran, supra*, at p. 1047.) To the extent the lack of evidence that defendant was punished for the prior rollover crash resulted in any arguable prejudice, we do not find it to be significant on these facts and, as discussed next, the trial court's instruction to the jury and the evidence's independence had a further ameliorative effect.

Pursuant to CALCRIM Nos. 303 and 375, the jury was instructed on evidence admitted for a limited purpose and uncharged acts as follows:

"During the trial, certain evidence was admitted for a limited purpose, and you may consider that evidence only for that purpose and for no other. The People have presented evidence of other behavior by the defendant that was not charged in this case that the defendant was involved in an accident on February 6, 2014. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged act. Proof by a preponderance of the evidence is different—is a different burden of proof than proof beyond a reasonable doubt.

"A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged act, you may, but are not required to consider that evidence for the limited purpose of deciding whether or not the defendant knew of the potential dangerous consequences of reckless driving a vehicle on a highway. In evaluating this evidence, consider the similarity or lack of similarity between the uncharged act and the [charged] offense. Do not consider this evidence for any other purpose. Do not conclude from this evidence that the defendant has a bad character or disposed to commit crime.

"If you conclude that the defendant committed the uncharged act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the charged or lesser crime. The People must still prove each charge and allegation beyond a reasonable doubt."

On review, we presume the jury understood and followed the instructions given. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422, 196 Cal. Rptr. 3d 424, 363 P.3d 41; see *Tran, supra*, 51 Cal.4th at p. 1050 [noting jury given limiting instruction in evaluating admission of prior uncharged acts under Evid. Code, § 352]; *Ortiz, supra*, 109 Cal. App. 4th at p. 118 [court's instructions on uncharged misconduct and evidence for a limited purpose further reduced any potential prejudice].)

22

In addition, evidence of the uncharged misconduct was independent from the evidence of the charged offense. This consideration is pertinent given the high court's recognition that "[t]he probative value of the [uncharged misconduct] evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated." (*Tran, supra*, 51 Cal.4th at p. 1047.)

**d. Undue Consumption of Time**

Finally, we also reject defendant's argument that presentation of the evidence amounted to "a substantial portion of the [four-day] trial" and was unduly time consuming. The testimony of the witness who saw defendant speeding up behind her and then rolling his car was straightforward and comprises fewer than 11 pages of the trial transcript; the testimony of the officer who responded to the witness's 911 call was also straightforward and comprises only five pages of the transcript. As well, the 911 call played for the jury was very brief and was transcribed in a single page. As such, defendant's assertion of undue consumption of time is directly contradicted by the record.

Under these circumstances, we conclude the trial court's decision to admit the evidence of defendant's prior rollover crash was not an abuse of discretion under Evidence Code section 352.

Contreras, No. F074151, 2018 Cal. App. Unpub. LEXIS 8480, at *31-46.

         *a.    Legal Standard and Analysis*

This claim is not cognizable on federal habeas review because the admissibility of evidence is a matter of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (state evidentiary ruling cannot provide ground for federal habeas relief unless the admission of evidence violated due process). In Holley v. Yarborough, the Ninth Circuit stated:

Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here"); see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such conclusions. Brown, therefore, cannot – as the petitioner in Moses could not – show that the state appellate court's ruling was either contrary to or an unreasonable application of clearly established Supreme Court precedent."). Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  Id.

Even if the Court were to consider the claim, Petitioner would not be entitled to relief. The appellate court discussed that the point of the evidence is the knowledge and understanding of the personal and social consequences imparted by virtue of having been personally involved in a vehicle crash caused by speed and reckless driving, which was underscored by the Petitioner repeatedly mentioning the prior rollover crash, both at the scene of the fatal collision and at the hospital. Contreras, No. F074151, 2018 Cal. App. Unpub. LEXIS 8480, at 38-39. The Fifth DCA accordingly rejected Petitioner's argument that the trial court erred in admitting the evidence of the prior rollover crash because it was not relevant and did not support a reasonable inference that Petitioner was subjectively aware of the dangers of driving recklessly at a high speed. Id. at 39. Additionally, the Fifth DCA concluded that the evidence of the uncharged crash, which showed only that Petitioner was speeding and driving recklessly when he lost control and rolled his car, did not result in any undue prejudice. Id. at 42. To the contrary, the Fifth DCA noted, the uncharged misconduct evidence was mild compared to the evidence of the charged offense. Id. The claim should be rejected.

## IV.     RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge

1  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

2  Rules of Practice for the United States District Court, Eastern District of California.  Within thirty

3  days after being served with a copy of this Findings and Recommendation, any party may file written

4  objections with the Court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be

6  served and filed within ten court days after service of the Objections.  The Court will then review the

7  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to

8  file objections within the specified time may waive the right to appeal the Order of the District Court.

9  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

10

11  IT IS SO ORDERED.

12      Dated:   **July 27, 2020**              **/s/ Jennifer L. Thurston**

13                                           UNITED STATES MAGISTRATE JUDGE